239 F.2d 351
 John R. DAUGAARD, a Minor, by Howard W. Daugaard, his Guardian, Appellant,
v.
HAWKEYE SECURITY INSURANCE COMPANY, a corporation, and Wolverine Insurance Company, a corporation, Appellees.
 No. 15554.
 United States Court of Appeals Eighth Circuit.
 December 17, 1956.
 
 James R. Adams, Sioux Falls, S. D. (Holton Davenport and Ellsworth E. Evans, Sioux Falls, S. D., were on the brief), for appellant.
 Gale B. Braithwaite, Sioux Falls, S. D. (J. W. Cadwell and Richard B. Braithwaite, Sioux Falls, S. D., were with him on the brief), for appellee, Hawkeye Security Ins. Co.
 H. L. Fuller, Sioux Falls, S. D. (M. T. Woods, J. B. Shultz and F. M. Smith, Sioux Falls, S. D., were with him on the brief), for appellee, Wolverine Ins. Co.
 Before SANBORN, JOHNSEN and WHITTAKER, Circuit Judges.
 SANBORN, Circuit Judge.
 
 
 1
 This is an appeal from a judgment dismissing the complaint of the plaintiff (appellant) in a nonjury action of which the District Court had jurisdiction because of diversity of citizenship and amount in controversy.
 
 
 2
 The case was submitted to the trial court upon an agreed statement of facts and some supplemental evidence. The plaintiff, a minor, was injured on April 3, 1952, when the automobile in which he was riding collided with an Oldsmobile driven by Donald Egge, a South Dakota farmer. The collision occurred not far from Sioux Falls, South Dakota. The plaintiff sued Egge in a State court of South Dakota, and recovered a judgment for $17,500 as damages. The car driven by Egge at the time of the accident belonged to Clifford Johansen and had been turned over by him to Egge on April 1, 1952. It had been insured by Johansen against liability for personal injury to the extent of $10,000. Johansen's liability insurer paid that amount in partial satisfaction of the plaintiff's judgment, leaving an unpaid balance of $7,500 and interest.
 
 
 3
 At the time of the collision on April 3, 1952, Egge had no automobile of his own. He had, however, two uncancelled automobile liability policies, each of which specifically described a motor vehicle which he had owned at the time the policy was issued, but which he had disposed of prior to the time of the accident. A policy issued on March 12, 1952, by the Hawkeye Security Insurance Company (hereafter referred to as "Hawkeye") specifically described a Dodge pickup truck, which Egge disposed of on March 27, 1952, by trading it in on another motor vehicle, which he sold prior to April 1, 1952. The other liability policy, issued to Egge by the Wolverine Insurance Company (hereafter referred to as "Wolverine") on July 8, 1951, specifically described a 1951 Buick, which Egge sold on March 4, 1952. He had, on February 20, 1952, ordered from an automobile dealer in Luverne, Minnesota, a new Buick, subject to delivery. It had not been delivered at the time of the accident.
 
 
 4
 The Wolverine policy had been procured by Egge from E. J. Pearson, of Brandon, South Dakota, who was a licensed agent for Wolverine. Pearson knew of the sale by Egge of the car described in the Wolverine policy and of Egge's having ordered a new car. Pearson suggested to Egge that he leave the Wolverine policy in effect, rather than cancel it "short rate", and that he transfer the policy to the new Buick when he obtained it. No Buick of the type ordered by Egge on February 20, 1952, was delivered until October 4, 1952. A different model Buick was delivered to him August 1, 1952, pursuant to an order of July 31, 1952.
 
 
 5
 The Hawkeye policy covering the Dodge pickup truck was procured by Egge from R. O. Wangsness, of Garretson, South Dakota, a licensed agent of Hawkeye. Wangsness knew of the sale by Egge of the pickup truck described in the Hawkeye policy.
 
 
 6
 The policies in suit contained substantially similar provisions, and both were in effect on April 3, 1952, "subject to the terms, conditions and limitations contained therein."
 
 
 7
 Upon the claim that the Hawkeye policy covered Egge's liability to the plaintiff resulting from the collision of April 3, 1952, and that Hawkeye was therefore obligated to pay the unpaid balance of the plaintiff's judgment, the instant action was brought against Hawkeye. By a third party complaint, Hawkeye brought Wolverine into the action as a third party defendant, asserting, in substance, that if Hawkeye were to be adjudged liable to the plaintiff, Wolverine would also be liable and should be required to pay its pro-rata share of the judgment.
 
 
 8
 Each of the defendants denied liability on the grounds that the motor vehicle described in its policy was not owned by Egge at the time of the collision and that the motor vehicle which he was then operating had been furnished for his regular use and was not within the coverage of the policy. Hawkeye in its answer asserted that the automobile was then being used by Egge in the operation of a sales agency.
 
 
 9
 By the terms of the policies in suit, the definition of "automobile" in Insuring Agreement IV includes the motor vehicle described in the policy and a "Newly Acquired Automobile — an automobile, ownership of which is acquired by the named insured who is the owner of the described automobile, if the named insured notifies the company within thirty days following the date of its delivery to him, and if either it replaces an automobile described in this policy or the company insures all automobiles owned by the named insured at such delivery date; * * *."
 
 
 10
 Insuring Agreement V, in pertinent part, provides:
 
 
 11
 "Use of Other Automobiles. If the named insured is an individual who owns the automobile classified as `pleasure and business', * * * such insurance as is afforded by this policy for bodily injury liability, for property damage liability and for medical payments with respect to said automobile applies with respect to any other automobile, * * *."
 
 
 12
 The automobiles described in the policies in suit were classified as "pleasure and business."
 
 
 13
 Subdivision (b) of Insuring Agreement V provides:
 
 
 14
 "This insuring agreement does not apply:
 
 
 15
 "(1) to any automobile owned by, hired as part of a frequent use of hired automobiles by, or furnished for regular use to the named insured or a member of his household other than a private chauffeur or domestic servant of the named insured or spouse;
 
 
 16
 * * * * * *
 
 
 17
 "(3) to any accident arising out of the operation of an automobile repair shop, public garage, sales agency, service station or public parking place.
 
 
 18
 * * * * *"
 
 Insuring Agreement VIII reads as follows:
 
 19
 "Policy Period, Territory, Purposes of Use. This policy applies only to accidents which occur and to direct and accidental losses to the automobile which are sustained during the policy period [one year], while the automobile is within the United States of America, its territories or possessions, Canada or Newfoundland, or is being transported between ports thereof, and is owned, maintained and used for the purposes stated as applicable thereto in the declarations [attached to the policy]."
 
 
 20
 With respect to the asserted liability of Hawkeye under its policy, the trial judge in his memorandum opinion said:
 
 
 21
 "Several issues and contentions by the various parties are presented by the pleadings and are covered by the briefs submitted. However, following the oral argument, these issues were narrowed considerably. It was conceded by counsel for the plaintiff that in order for there to be any coverage under either of the insurance policies here involved, and as a basis for plaintiff's right of recovery herein, Donald Egge must have been the owner of an automobile as such `automobile' is defined under the policies in question. Such an automobile, the ownership of which must have been in Donald Egge at the time of the accident must either be the `described automobile', or, under IV (4) a `newly acquired automobile'. It is undisputed that Egge sold the 1951 Buick described in the Wolverine policy on March 4, 1952, and that on or about March 31, 1952, sold the pickup truck described in the Hawkeye policy. It was likewise conceded during the oral argument that Egge's newly acquired automobile, if any there was, must have replaced the automobile described in the policy of insurance, and would not be just an additional automobile. It was likewise conceded by plaintiff's counsel that the `new car order', a copy of which is attached to the agreed statement of facts, was intended to replace the 1951 Buick described in the Wolverine policy, and that because it did not replace the pickup truck described in the Hawkeye policy, that at the time of the collision Egge was not the owner of an `automobile' such as is required under the terms of the Hawkeye policy to render that company liable in this action. Therefore, judgment herein will be in favor of the Hawkeye and against the plaintiff."
 
 
 22
 With respect to the asserted liability of Wolverine to the plaintiff under its policy, the trial judge ruled that Egge, at the time of the collision, did not have a "newly acquired automobile" within the meaning of the policy, and that, since he had sold the Buick automobile described in the policy, Wolverine was not liable to the plaintiff.
 
 
 23
 Counsel for the plaintiff do not concede upon this appeal that Egge, at the time of the collision, must have been the owner of an "automobile" as defined in the policies in suit in order to have coverage. It is now contended on behalf of the plaintiff that, since Egge owned the automobiles described in the policies at the time they were issued, and since Insuring Agreement V covered the use of other automobiles not owned, and since the policies contained no provision that a sale of the "described automobile" should terminate or suspend that coverage, it must be held that the liability of Egge to the plaintiff, due to Egge's use of the Johansen car, was covered by the policies in suit.
 
 
 24
 The defendants argue that the plaintiff should be held to be bound by the concession of his counsel at the trial, that to be within the coverage of the policies Egge must have owned an "automobile" at the time of the collision. We think an erroneous concession as to the coverage of a policy of insurance which is before a trial court for interpretation should not be held to bind a litigant. The question of coverage under the policies in suit, which were South Dakota contracts, was a question of South Dakota law, and not an issue of fact. If the trial court, in reliance upon the concession of counsel for the plaintiff, misconceived or misapplied the applicable law, the judgment should, we think, nevertheless be vacated.
 
 
 25
 We agree with the trial court that Egge, at the time of the collision, did not own an "automobile" within the meaning of either policy. That being so, Egge was not at that time covered by Insuring Agreement V of either of the policies in suit, since he was not "an individual who owns the automobile classified as `pleasure and business'", and there was no insurance afforded by the policy "with respect to said automobile" and therefore none applicable "to any other automobile." Insuring Agreement VIII, requiring that the automobile insured be "owned, maintained and used" for stated purposes, and limiting coverage territorially, inferentially supports the conclusion that coverage under Insuring Agreement V expired when ownership ended.
 
 
 26
 Concededly, this conclusion is not contrary to any pertinent decision of any court of South Dakota. The plaintiff finds some support in Freeport Motor Casualty Co. v. Tharp, 338 Ill.App. 593, 88 N.E.2d 499, 500, for his construction of the policies. It was held in that case that retention of ownership of the automobile described in a liability policy similar to those in suit was unnecessary to protection under the "use of other automobiles" provision. The opinion in that case is not persuasive. The court seems to have treated a rather obvious limitation of coverage as a provision for forfeiture. Its decision is based in part upon the fact that the automobile described in the policy had broken down, been withdrawn from service and sold for junk, and that the policy provided coverage for the "`Temporary use of Substitute Automobile.'" The Tharp case was affirmed by the Supreme Court of Illinois on procedural grounds, and not on the merits. 406 Ill. 295, 94 N.E.2d 139.
 
 
 27
 The conclusion of the District Court that ownership of an insured automobile at the time of the accident was a prerequisite to coverage under Insuring Agreement V is supported by Campbell v. Aetna Casualty & Surety Co., 4 Cir., 211 F.2d 732, 735-736, and Byrd v. American Guarantee & Liability Ins. Co., D.C.E.D. Va., 89 F.Supp. 158, 159-160.
 
 
 28
 The burden of demonstrating that the trial court misconstrued the South Dakota policies in suit is upon the appellant. He has been unable to show that the conclusion reached by that court is contrary to any rule of local or general law or to the plain terms of the policies or that they were reasonably susceptible to a construction more favorable to the insured.
 
 
 29
 The attitude of this Court toward acceptance of the considered and not demonstrably erroneous views of a trial judge with respect to doubtful questions of the local law has been repeatedly stated by this Court. See Buder v. Becker, 8 Cir., 185 F.2d 311, 315; Mogis v. Lyman-Richey Sand & Gravel Corp., 8 Cir., 189 F.2d 130, 134; Citizens Insurance Co. of New Jersey v. Foxbilt, Inc., 8 Cir., 226 F.2d 641, 643.
 
 
 30
 The judgment appealed from is affirmed.
 
 
 31
 JOHNSEN, Circuit Judge (dissenting).
 
 
 32
 Egge, the owner of a Buick automobile, took out liability insurance on it in the Wolverine Insurance Company. The policy issued to him by the Company's resident agent provided that such coverage would exist in his favor, not merely as to the Buick, but also as to any automobile not owned by him "while temporarily used as the substitute for the described automobile while withdrawn from normal use because of its breakdown, repair, servicing, loss or destruction".
 
 
 33
 Obviously, the use of the terms "loss" and "destruction" implied and contemplated that a situation could physically come to exist in which there might no longer actually be ownership by Egge of the Buick car as such and as a further risk-subject,[1] but in which the insured nevertheless would be possessed of liability coverage as to another car not owned by him, "temporarily used as the substitute for the described automobile". And such a situation would also naturally tie into the further provision of the policy, for an extension of its coverage to a "newly acquired automobile", if the latter "replaces an automobile described in this policy", and "if the named insured notifies the company within thirty days following the date of its delivery to him".
 
 
 34
 It therefore does not seem to me that it can be held, generally and absolutely, as the trial court and the majority here have done,[2] that, in any hiatus of actual automobile ownership by the insured, all protection under the policy will necessarily cease. Such a holding fails to take account of the fact that, in situations of "loss" or "destruction" at least, as I have pointed out, coverage is provided as to a "temporary substitute automobile", even though no physical existence or ownership of the described automobile can insurably or legally be said to have survived.
 
 
 35
 When the present situation is approached in this light, I think there is suggested a different policy perspective and coverage aspect in relation to the facts before us than have been given recognition by the majority opinion.
 
 
 36
 Egge had taken out the liability policy on July 8, 1951, for a term of one year. Seven months later, he wanted to replace the insured car with a new Buick. He placed a signed order with the dealer on February 20, 1952, specifying the type of car he wanted, but was told that there would be a delay in his obtaining delivery. After a lapse of two weeks, on March 4, 1952, he sold the car described in the policy. He went to the insurer's agent and told him all the facts as to his situation. The agent suggested that he allow the policy to continue and become applicable to the new Buick as a replacement, when the car was delivered to him.
 
 
 37
 The new car had not yet become available at the time the accident occurred. This was on April 3, 1952, within 30 days after the sale of his described car and after the agent's suggestion and agreement to let the policy remain in effect. The car with which he had the accident was an Oldsmobile passenger automobile, owned by a third party, and being driven by Egge under circumstances and conditions from which the trial court could have found that it was being used by him at the time as a "temporary substitute automobile",[3] if that coverage was otherwise capable of being regarded as not having ceased under the policy.
 
 
 38
 As previously observed, if Egge's ownership of the described automobile had ceased to exist as a matter of loss or destruction of the car, temporary coverage would, under the terms of the policy, still have existed in his favor as to his use of a "temporary substitute automobile". At what point, in period, extent, nature or incidents of such a use, the bounds of this temporary coverage might have been passed, so as to fall outside the intention of the policy, would, I think, in the absence of any definitiveness in the contract itself, ordinarily be a question for resolution on a trial, in relation to the circumstances of the particular situation presented. In any event, it would not seem to be possible to declare generally, as a matter of law, that such coverage could not at all be regarded as having been intended to exist for a period of 30 days (within which time the accident here involved occurred), at least when a replacement car had been promptly ordered, in the light of the provision giving the insured a period of 30 days, after delivery, in which to notify the insurer of the fact of a replacement.
 
 
 39
 Unless therefore there are some other provisions in the policy which, as a matter of law, preclude a consideration of the facts of the present situation in relation to the apparent purpose and spirit of the provision for temporary coverage as to a transient substitute automobile, I believe that the case should be remanded to the trial court for a resolution and appraisal of the circumstances related to the particular automobile and its use.
 
 
 40
 The majority opinion, as I have noted, does not give any consideration to the language and implications of the "temporary substitute automobile" provision where liability coverage has ceased to be present as to the described car from cessation of ownership. The opinion predicates its result primarily on Insuring Agreement V, "`use of other automobiles'", relying upon the condition prescribed by that Insuring Agreement for the existence of such additional insurance — "If the named insured is an individual who owns the automobile classified as `pleasure and business' * * *." It also calls attention to the provision of Insuring Agreement VIII, that "This policy applies only to accidents which occur * * * while the automobile * * * is owned, maintained and used for the purposes stated as applicable thereto in the declarations".
 
 
 41
 If coverage was capable in the circumstances of existing under the provision of Insuring Agreement IV as to "temporary substitute automobile", then the coverage of Insuring Agreement V as to "`Use of Other Automobiles'" would not be involved. But even if Insuring Agreement V were applicable, I think the emphasis in the condition quoted above is upon the fact that the car ownership involved under the policy must be by "an individual" and not by a corporation or association, in order for any coverage to exist as to the "`Use of Other Automobiles'". And, as to Insuring Agreement VIII, it equally seems to me that the emphasis in the language quoted from this portion of the policy is on a differentiating of the accidents occurring from the described automobile, as a matter of closing the door to any possible contention with respect to accidents which may occur outside the ownership, maintenance and use-purposes set out in the declarations. Thus, for one thing, the language quoted would prevent a purchaser of the car from claiming under any circumstances, regardless of what the relations between himself and the insured may have been, that an accident occurring in his ownership, maintenance and use of the automobile was covered by the policy.
 
 
 42
 In this connection, reminder may be made, though it should hardly be necessary to do so, that under the law of South Dakota, as generally, "if there is any uncertainty or ambiguity in the contract of insurance it must be construed most strongly against the insurer and in favor of the insured." Ehrke v. North American Life & Casualty Co., 71 S.D. 376, 24 N.W.2d 640, 641; Sunshine Mutual Ins. Co. v. Addy, 73 S.D. 595, 47 N.W.2d 285; Melham v. Watertown Sash & Door Co., 67 S.D. 254, 291 N.W. 735.
 
 
 43
 To bring the situation into focus again, I shall, in concluding, briefly repeat the facts. Five months before the expiration of his insurance contract, Egge ordered a new Buick to replace the one covered by his policy. Delivery of the new car could not momentarily be obtained. He waited two weeks before selling his old car. He then went to the insurer's agent and told him all the facts of the situation. The agent suggested that the policy be allowed to stand so that it could cover the new car when it was delivered. Within 30 days thereafter, and while Egge was driving an Oldsmobile car owned by another, which on the evidence it could be found that he had been given the right to use temporarily for such purpose, among others, as the insured car had previously served, and that he and his wife had so used it on two occasions only, the accident involved occurred. The answer of the insurer admitted that the policy was "in full force and effect" at the time the accident occurred.
 
 
 44
 On these facts, I think that it was possible to find that the insurer's agent, in suggesting that the policy not be terminated but continued, had treated the situation, as related to Egge's sale of his car, his preceding ordering of a replacement therefor, and his awaiting of delivery thereof, as entitling the coverage to stand, on the same basis in the particular situation, where knowledge had been imparted to him of all the facts, as if there had been a loss or destruction of the car, with the bridging right in Egge, for a reasonable period under all the circumstances, to make use of a temporary substitute automobile, while a replacement was in the process of being obtained.
 
 
 45
 Or alternatively, I think that there equally was room to view the situation as constituting one in which the agent, with his knowledge of the facts, and for purposes of not having the policy cancelled, had permitted the ordered car to be treated constructively as a replacement, "withdrawn from normal use" for a reasonable period of delivery, and thus keeping in effect the auxiliary incidents of coverage which would exist in relation to this practical treatment of the particular circumstances.
 
 
 46
 It may be added, in connection with what I have said, that, in the agent's continuation of the policy, the Company received a premium for the risk period that is here involved, in the same amount as if the described car had not been sold or as if the replacement car had concurrently been delivered, and that the hazard as to the use of the Oldsmobile car in temporary substitution also was the same in each situation.
 
 
 47
 What I have said is not to be taken to mean that I think that liability necessarily must be held to exist in the situation. I am merely expressing the view that the facts of the situation entitle the case to be approached in this channel and devalued on this basis, and that it should therefore be remanded to the trial court for such a consideration. Such a consideration might perhaps involve other elements of defense not here urged, and these ought, of course, to be left open to the insurer in any further proceedings had.
 
 
 48
 It is not necessary for me to give any consideration to the policy of the Hawkeye Security Insurance Company, for that policy was issued in relation to a Ford Farm Pick-up Truck, for which the ordered Buick car was in no way intended to constitute a replacement, and as to which the Oldsmobile passenger automobile could not at all, in its use at the time of the accident, be claimed to represent a temporary substitute.
 
 
 49
 I would accordingly reverse the judgment of dismissal made as to the Wolverine Insurance Company and remand the case for further proceedings in relation to the views which I have expressed.
 
 
 
 Notes:
 
 
 [1]
 Though perhaps unnecessary, hypothetical illustrations may be given of situations in which the insured could be left without ownership of the described car, but where he nevertheless would have some measure of protection, under the terms of the "temporary substitute automobile" provision, in his temporary use of another car. Thus, the Buick might have become involved in a bridge accident, causing it to plunge off and be submerged in such a depth of water as realistically to prompt the insured to make a legal abandonment and to constitute a "loss" of it. Or the car could have become so completely consumed by fire or other element as to make its "destruction" leave it without substance or capacity for further ownership, whether as an automobile or otherwise
 
 
 [2]
 The majority opinion says that, since Egge was without ownership of the Buick car at the time of the accident involved, "there was no insurance afforded by the policy `with respect to said automobile' and therefore none applicable `to any other automobile'."
 
 
 [3]
 The evidence would also have permitted the court to reach a contrary conclusion on the circumstances related to the use on the particular occasion, but this is not of importance here, since that question was in no way considered or involved in the disposition which the trial court made